Jimmie Lee RILEY, Plaintiff,

v.

Perry JOHNSON, Director of Michigan Department of Corrections, et al., Defendants.

Civ. No. 77–71759.

United States District Court, E. D. Michigan, S. D.

Nov. 27, 1981.

Peter J. Kelley, Kelley & Rhodes, Ann Arbor, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen., J. Peter Lark, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION

COHN, District Judge.

### I.

#### 1.

This is a 42 U.S.C. § 1983 prisoner civil rights case tried to the Court. Plaintiff, Jimmie Lee Riley (Riley), is a resident at the State Prison of Southern Michigan at Jackson (Jackson) serving a 40–50 year term for assault with intent to commit murder. He will be eligible for parole consideration for the first time in 1985.

Riley started this case *in pro per* on July 18, 1977. After considerable pre-trial activity counsel was appointed for him on March 30, 1979. In an amended complaint filed January 2, 1980 Riley alleged deprivation of his Fourteenth Amendment right to due process on the grounds he was illegally confined to punitive detention and administrative segregation from April 10, 1977 to May 20, 1977 at Jackson and of his First Amendment right to freedom of expression because during that period he was denied postage stamps. In addition to a claim for damages Riley asked the Court to enjoin confinement in punitive detention or administrative segregation at Jackson beyond the length of time expressly provided for in the Michigan Department of Correction rules and regulations.

The Attorney General, who is representing the individual defendants (Mich.Stat. Ann. § 3.996(108) [M.C.L.A. § 691.1408]), says that the request for injunctive relief is moot as a consequence of changes made in confinement procedures at Jackson since 1977 partly as a result of the consent order in *Jackson v. Johnson*, Civil No. 78–70752 (E.D. Mich. December 4, 1980). Defendant Duane Sholes (Sholes) acknowledged during trial that Riley's circumstances were in part responsible for the Department of Corrections' willingness to agree to the consent order.

### 2.

Sholes was Assistant Deputy Warden in Charge of Security and Classification at the Central Complex at Jackson in 1977; defendant David Jamrog (Jamrog) was Assistant Unit Manager of 5 Block-West (5 West) in the Central Complex at Jackson in 1977.

Sholes' duties included responsibility for security, care of residents and maintenance of staff in the Central Complex as well as overall responsibility for the classification and review of the status of residents in 5 West during the period in question.

Jamrog's duties included care and maintenance of 5 West, supervision of staff and review of the status of residents in administrative segregation. His superior was the unit manager who in turn reported to Sholes.

Riley claims that Sholes and Jamrog were responsible for the length of his illegal confinement and therefore liable to him for the damages he suffered. Sholes and Jamrog say there was no willful or deliberate violation of Riley's rights; rather because of overcrowding at Jackson Riley was "lost in the shuffle" and as a consequence was confined longer in administrative segregation than he should have been.

### 3.

The trial took two days. The Court heard from ten witnesses, including the parties, as well as four residents, a reviewing officer, the unit manager of 5 West, a correction specialist (i.e., guard) and the administrative assistant to the Deputy Warden in Charge of Housing, Harry C. Parcyck (Parcyck). A number of exhibits were received in evidence including misconduct reports, rules and regulations, written communications and confinement records.

### 4.

For the reasons which follow, which constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a), the Court finds and concludes: 1) that Riley was confined in administrative segregation in 5 West illegally for at least ten days; 2) that Jamrog and Sholes knew or should have known of the illegal confinement; 3) that they failed to take the steps necessary to assure its termination; 4) that they therefore bear responsibility for it and are as a consequence liable in damages to Riley.

The claim for injunctive relief is mooted by the consent order in *Jackson, supra.*

### II.

### 1.

On April 10, 1977 Riley was administratively charged with sexual misconduct. At that time he was in the general resident population at Jackson which entitled him to a wide variety of privileges and opportunities. For reasons not fully explained, and apparently in violation of Department of Correction rules and regulations, Riley was

"not bonded" at the time he was charged and as a consequence he was transferred to administrative segregation, which meant he was removed from the general resident population and placed in a cell on the ground floor of 5 West. No written statement as required by the rules and regulations was made why Riley represented a threat if he were put on bond.

Had Riley been bonded he would have continued in his assigned cell in the general population pending a hearing on the misconduct report. Because he was not bonded he lost his cell.

### 2.

5 West is part of 5 Block at Jackson which in turn is part of the Central Complex or walled portion of the prison. It contains approximately 227 cells in a number of tiers. The bottom tier or ground floor is commonly called "base" while the upper tiers are called the "galleries".

In 1977 5 West was used to confine residents classified to administrative segregation because they were considered high security risks or classified to punitive detention because they were found guilty of misconduct, and residents charged with misconduct and not "bonded". It was also used to house residents for other reasons unrelated to their security classification or conduct such as being in transit or newly admitted.

In general the ground floor or base cells were used for those residents found guilty of misconduct and confined to punitive detention while the galleries or upper tiers were used for residents classified to administrative segregation or otherwise in 5 West. The first tier of the galleries was generally used for residents awaiting hearings on misconduct charges and "not bondable".

### 3.

Under Department of Correction rules and regulations administrative segregation was the most restricted security classification requiring confinement in a specially designated area; at Jackson this was 5 West. Special safeguards applied to this classification including a twice monthly interview (once a month in the Spring of 1977 because of a staff shortage). Technically Riley, since he was never classified to administrative segregation, was not subject to the review requirement while he was in 5 West. Jamrog testified, however, that a resident in Riley's circumstances was included in the review process by a security classification committee with a written account going to the resident. A resident could not be classified to administrative segregation without a hearing.

Under the rules and regulations confinement to punitive detention to be served in a base cell was limited to a maximum of seven days with the maximum time reserved for the most serious or persistent violations.

The rules and regulations regarding classification have been codified and are now found in the Commission of Corrections, General Rules, 3 Mich.Ad.Code R. 791.4401 and R. 791.4405. The rules regarding punitive detention are found at 3 Mich.Ad.Code R. 791.5501, R. 791.5505 and R. 791.5510. These rules in substantially the same form were also contained in the Michigan Department of Corrections Hearings Handbook and in the Resident Guide Book in 1977, of which Riley presumably had a copy and with which he was presumably familiar. Excerpts are attached as Exhibit A.

### 4.

Privileges and opportunities in 1977 in 5 West were substantially limited. As undesirable as conditions were in the galleries or upper tiers, conditions in the base cells were even less so. The base cells lacked light and had thinner mattresses and harder beds than those in the galleries. There were no telephones; residents were not allowed any personal possessions including books or radios and store services were not available. Confinement to a base cell was a form of punishment. Residents in administrative segregation, while allowed somewhat greater privileges than those in the base cells, were not allowed to participate in recreational programs or work activities.

**5.**

Jackson was overcrowded in the Spring of 1977. As a consequence there were a number of residents in 5 West who did not belong there but could not be moved out because of a lack of cells available for the general population. At any one time there were perhaps 75 residents waiting to be moved out; the time lag was anywhere from seven to twenty days. The average overall length of stay was approximately 23 days.

When a resident was eligible to move out of 5 West his name went to the Deputy Warden in Charge of Housing who maintained several rotating lists of names depending on a resident's status. New names would be added to the bottom of the appropriate list; when a name reached the top of a list and a cell became available in the general population a transfer would be effectuated. A resident who was in 5 West because he had been charged with misconduct and had not been bonded and was found not guilty of the charge had a top priority for being moved out. Residents in 5 West newly admitted or in transit returning from court appearances, etc., were on separate lists and also had top priority for moving out. A resident reclassified from administrative segregation to the general population did not have the same priority for being moved out. A resident found guilty of misconduct and confined to punitive detention who served his period of confinement also had a priority. If a cell in the general population was not immediately available in the general population he would stay in 5 West in one of the upper tiers until a cell became available unless he was reclassified to administrative segregation in which event he continued in 5 West until reclassified.

Names came to the Deputy Warden in Charge of Housing in two ways. Each day names would be sent to his office from the unit manager of 5 West and be added to the several lists. The name of a resident who was in 5 West because of a misconduct charge and who was found not guilty would be sent from the Hearings Division. Each day a hearing officer in the Hearings Division would send a rundown of the results of the hearings of the day to the Deputy Warden in Charge of Housing. Included in this list would be the names of residents found not guilty of misconduct. These were listed on the hearing officer's remarks sheet. The names of residents found guilty of misconduct would go to the Deputy Warden in Charge of Housing from the Hearings division on a list called a "flimsy". It contained the resident's release date from punitive detention. Parcyck was in charge of maintaining the several lists on behalf of the Deputy Warden in Charge of Housing. He would pick up the names either from the unit manager's list or from one of the lists sent in by the Hearings Division and transfer them to his own work papers or lists.

**6.**

5 West was served by a number of Department of Corrections employees. The unit manager was in charge of care and maintenance of the unit and supervision of staff as mentioned above. Jamrog, as assistant manager, performed these duties under the unit manager. Jamrog also participated in the required review of residents classified to administrative segregation which included review of the residents who had served their time in punitive detention and were waiting transfer to the general population. As mentioned, the rules required a hearing before a resident could be classified to administrative segregation, a review of the status of each resident in administrative segregation and a written account of the review. The record is silent as to any written account of Riley's status while in 5 West. Given the length of his confinement in 5 West it is reasonable to assume that in the normal course of events his status should have been reviewed at least once.

Sholes, as Assistant Deputy Warden in Charge of Security and Classification for the Central Complex, was in overall charge of 5 West. He supervised the unit manager and was directly responsible for the security review required for residents in administra-

tive segregation. Sholes could order a change in classification and through the Deputy Warden in Charge of Housing effect a transfer out of 5 West regardless of where a name stood on the priority list. Sholes visited 5 West every day and made frequent visits to the base cells and the galleries. In his testimony he acknowledged receiving complaints from residents about not being moved out.

### 7.

As noted, Riley was charged with misconduct on April 10, 1977 and listed as non-bondable. When Riley was transferred to 5 West he was placed in a base cell rather than in the first tier presumably because no other cell was available, although no proof was offered of the availability or lack of availability of cells in the galleries on April 10. According to the practice at the time, once a resident was placed in a base cell, even though he didn't belong there as in Riley's case, no effort was made to move him up when a cell was available in the galleries.

Riley's misconduct hearing was held on April 13, 1977 and adjourned on that date at his request because of the lack of a witness. At the adjourned hearing on April 18, 1977 Riley was found not guilty, making him immediately eligible for return to the general population. Meanwhile on April 17, 1977 Riley was transferred to a gallery cell on 5 West. Riley was transferred back to the general population on May 20, 1977.

Riley stayed seven days in punitive detention while awaiting a hearing on the misconduct charge (the maximum amount of time he would have spent there had he been found guilty of misconduct) and spent another thirty days in administrative segregation although classified for the general population. Therefore Riley's liberty was substantially more restricted under substantially less favorable conditions for a period of 37 days than his classification authorized.

### 8.

During the April 17, 1977 to May 20, 1977 period a number of residents were classified into administrative segregation on 5 West or transferred into 5 West and then re-turned to the general population while Riley remained in 5 West. This indicates the availability of a cell in the general population for Riley had he been properly transferred out. If Riley had immediately been listed with the Deputy Warden in Charge of Housing as eligible to be placed in the general population, as he should have been on April 18, 1977, he would have returned to the general population at least ten days sooner than May 20, 1977. Riley's overall stay in 5 West was 40 days of which seven were spent in a base cell. Taking the average length of stay as twenty-three days and adding the seven means Riley spent at least ten days too long in 5 West. For example, Charles Anderson, who was charged with Riley and found guilty of misconduct, served seven days in punitive detention and returned to the general population on April 19, 1977.

No reason for Riley's confinement in a base cell for seven days while awaiting a hearing on the misconduct charge was offered other than the general statement that no cell was apparently available in the galleries.

As to the reason for Riley continuing in administrative segregation for some thirty days, the evidence showed it was simply because his name was not on any list maintained by the Deputy Warden in Charge of Housing. Either the hearing officer neglected to send it over or Parcyck missed it. The Court concludes it was likely the former.

In sum, the record shows that the cell shortage at Jackson in 1977 had nothing to do with the length of time Riley spent in administrative segregation in 5 West.

### III.

### 1.

Riley was not a complainer; he was however a resident who knew his rights and asserted them vigorously. On April 22, 1977 Riley wrote the Director of the Department of Corrections complaining that he was being illegally confined to 5 West.

He received a reply on April 29, 1977 suggesting that he follow the prison grievance procedures and was advised that if he discussed the matter with his counselor he would be provided with the necessary forms. The letters went through channels. The reply to Riley's letter was initially directed to the Marquette Branch Prison and hence took an extraordinary long time getting to Riley.

Riley wrote again to the Director on May 10, 1977 detailing his illegal status in 5 West. On May 20, 1977 he received a reply from the Assistant Deputy Director of Operations that he had discussed the matter with Sholes and that "Mr. Sholes explained that somehow you were lost in the shuffle". The letter apologized to Riley and advised that he would be placed in the general population that day.

Riley testified that he complained to Sholes on two occasions, Jamrog on numerous occasions and to Travis Jones, the unit manager of 5 West, and Robert Cotton, a corrections officer, on at least one occasion each. The three residents who testified confirmed Riley's account of his complaints and his talking to Sholes and Jamrog about his status and that on one occasion Jamrog responded to Riley by saying, "that's the way the breaks are".

In particular Riley testified he spoke to Sholes on April 15, 1977 while he was in punitive detention and was told there were no other cells available and that approval had been obtained to use the base cells for residents awaiting misconduct hearings. Riley further testified he spoke to Sholes several times again and was told, "we'll get to you". Riley also testified he spoke to Jamrog twice and was told that his situation would be called to Sholes' attention and that his situation would be taken up with the housing deputy.

Riley's testimony about "kites", i.e., messages placed in the bars of his cell to be picked up by a guard, while confirmed by his fellow residents was not confirmed by any of the Department of Correction records subpoenaed for trial.

2.

As to the failure to provide him with stamps, Riley testified that he had no money to purchase them and, while they were supposed to be available without charge in a limited number, he never received any. Overall the testimony regarding stamps was confusing. It is possible that Riley was denied stamps while in 5 West contrary to Department of Correction rules and practices. There was, however, no clear tie to Sholes or Jamrog and therefore the Court will not consider this issue further.

IV.

1.

Jamrog in his testimony described the review procedures for residents in administrative segregation (which would have included Riley) and stated that he talked to each of them. He described the overcrowded conditions and the substantial number of residents that passed through 5 West each month. He further testified as to the concerns about overcrowding and the changes in procedures which were subsequently made. He recalled being aware of Riley's problem and that he checked with the office of the Deputy Warden in Charge of Housing. He could not remember if he discussed it with Sholes or that any other officer ever mentioned it to him. He acknowledged a responsibility to bring the problem to Sholes' attention and testified in a pre-trial deposition that he is sure he did so verbally. In his deposition testimony, though not at trial, Jamrog testified that if there was a complaint from a resident such as Riley he checked the lists maintained by the Deputy Warden in Charge of Housing.

2.

Jamrog was somewhat inconsistent in his testimony. Given the length of time since 1977, the conditions in 5 West and the pressures of the job the Court gives Jamrog some latitude. After full consideration of the record, however, including Riley's and his fellow residents' description of Riley's protestations, the Court finds that Jamrog knew or should have known of Riley's ille-

gal stay in 5 West including the seven days in a base cell (excerpts from his testimony are attached as Exhibit B). The Court finds that he was either grossly negligent, deliberately indifferent or willful in his failure to assure himself that Riley's name was actually on the priority list in the office of the Deputy Warden in Charge of Housing. Simply talking to Parcyck was not enough. Admittedly on May 20, 1977, the day of Riley's transfer to the general population, his name was not on any list.

## V.

### 1.

Sholes testified as to the difficulties at Jackson in 1977 because of overcrowding, the problems of 5 West and what has been done since to assure no one gets "lost in the shuffle". Sholes did not recall any conversation with Riley or any personal knowledge of his circumstances until the day of his transfer out although he acknowledged that he personally received complaints from residents about overstays. Sholes knows Riley. He said that since he knew him he probably talked to him and likely told him he was on the rotation list. He further said that Riley was likely to have raised hell and that it was more than likely that Jamrog or Travis Jones or Robert Cotton should have done something about it.

Sholes acknowledged that on occasion residents were lost but it was usually a person who did not complain. He said he'd been in the business, i.e., as a corrections official, too long to deliberately keep Riley off a rotation list or cut him off; to do so he said would have been malicious. Absent from his testimony, however, was any description of any special effort on his part to assure that the names of each of the residents in 5 West waiting for a cell in the general population were recorded on one of the lists maintained by the Deputy Warden in Charge of Housing.

### 2.

Notwithstanding Sholes'· testimony the Court finds he shares responsibility. The failure to put Riley's name on the rotation list was more than error, inadvertence or carelessness. The Court finds that Riley's circumstances were either known or should have been known to Sholes in a way that placed an obligation on him to personally check the rotation list in the office of the Deputy Warden in Charge of Housing. Jamrog had a line responsibility in these matters; Sholes had supervisory responsibility. Like Jamrog, Sholes failed to fulfill his responsibilities. Had he done so Riley would have been moved back to the general population considerably sooner.

## VI.

### 1.

Riley's right to recover damages from Jamrog or Sholes stems from 42 U.S.C. § 1983 which reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

As stated by the Supreme Court in *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981):

". . . in any § 1983 action the initial inquiry must focus on whether two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."

Each element is present here. Again quoting from *Parratt:*

"[Jamrog and Sholes] were, after all, state employees in positions of considerable authority. They do not seriously contend otherwise. Our inquiry, therefore, must turn to the second requirement—whether [Riley] has been deprived of any right, privilege or immunity secured by the Constitution or laws of the United States."

451 U.S. at 535–36, 101 S.Ct. at 1913.

■ Riley had a constitutional right to be free from confinement in administrative segregation at Jackson. In *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980), the Sixth Circuit addressed the question of whether a prisoner in the Tennessee prison system had a protected liberty interest that requires certain due process standards be met prior to a transfer to administrative segregation. The regulations relating to confinement in Tennessee prisons are substantially the same as the Department of Corrections Rules and Regulations. After analyzing the Tennessee rules in some detail and the related case law the Sixth Circuit found that:

"... the Guidelines ... limited the discretion of prison officials in making decisions regarding administrative segregation and created a legitimate expectation on the part of inmates that they would not be transferred to administrative segregation absent a finding that such transfer was for the purpose of protecting that inmate or other inmates or for the purpose of promoting and maintaining order within the institution."

631 F.2d at 1294. *See Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal. 1976), *aff'd.*, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Once Riley was found not guilty of the misconduct charge he had a right under the rules and regulations to go back to the general population. For Riley to continue in administrative segregation required that he be reclassified to that category following the procedures established in the rules and regulations for such action. There is no claim here that the required reclassification procedures were followed; rather as indicated defendants admitted Riley was "lost in the shuffle".

**2.**

Defendants' attempt to justify Riley's continued confinement on the authority of *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Gibson v. Lynch*, 652 F.2d 348 (3rd Cir. 1981), is not persuasive.

*Meachum* held that given a valid conviction there was no due process violation by a change in a prisoner's classification so long as the conditions of confinement did not otherwise violate the Constitution. There a prisoner complained that an interprison transfer put him in a higher security prison with greater restrictions on his freedom and liberty and that the transfer had been made without a hearing. The prison regulations in question did not condition the transfer on the occurrence of a specific event. The Supreme Court said:

"Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

* * * [T]o hold as we are urged to do that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."

427 U.S. at 225, 96 S.Ct. at 2538.

*Gibson* follows *Meachum*. In *Gibson* the plaintiff had been placed in administrative segregation as a matter of course in the process of locating new prisoners in the prison system at a time when the system was critically overcrowded. The Third Circuit held that an entering prisoner, who had never been assigned a place in the less restricted general population in the first

place, had no claim to a protected liberty interest in being placed in the general population. The Third Circuit also pointed out that any procedures which might have applied to the plaintiff would have availed him nothing since they would have resulted in a determination that there was no room in the general population. The Court finds a significant difference in Riley's situation compared to the plaintiff in *Gibson.*

### 3.

While Riley complains of his confinement to a base cell for seven days and the entire length of his confinement in 5 West as a due process violation, the Court has determined that the length of Riley's illegal confinement was ten days thus giving defendants some credit for the overcrowding at Jackson. Riley, however, had a right to be in the general population once found not guilty of misconduct; he had a protected liberty interest in being free of administrative segregation. He could not be retained indefinitely in 5 West. *Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979). Had the rules and regulations been followed or had Riley's name been timely placed on the priority list maintained by the Deputy Warden in Charge of Housing he would have been back in the general population at least ten days sooner.

The consent decree in *Jackson, supra,* is an implicit recognition of Riley's illegal confinement. Likewise the decision in *Simon v. Sholes, et al,* Civil No. 79–71320 (E.D. Mich. June 18, 1981), is recognition of Riley's illegal confinement. In *Simon,* Judge Ralph Freeman concluded

" . . . that retaining Simon in administrative segregation beyond the four workday limit without a hearing that determined his security classification was not authorized by prison procedures and violated plaintiff's constitutional rights to an adequate hearing prior to being placed in administration segregation."

*Id.* at 11.

### VII.

### 1.

 Somewhat more difficult is a determination of the personal liability of Jam-

rog and Sholes with regard to Riley's wrongful confinement. As stated in *Redmond v. Baxley,* 475 F.Supp. 1111, 1115 n. 2 (E.D.Mich.1979), "There must be a degree of personal involvement that connects [the defendant] to the claimed deprivation of a constitutional right". Under § 1983 a public official (here a prison guard) cannot be held vicariously liable for the wrongdoing of others, *Monell v. New York City Department of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1977).

A detailed analysis of the law in this area is not necessary. In *Redmond, supra,* Judge Philip Pratt exhaustively analyzed the case law before formulating a jury instruction in an analogous situation. The instruction read:

" . . . in order to find fault or liability on the part of a defendant, you must find that he acted, or failed to act, with deliberate indifference or callous neglect. This means that before either of the defendants can be found liable you must find that he was aware or knew of an unreasonable, serious risk of harm to the plaintiff and that the defendant failed to take the steps a reasonable person in his position would have taken to eliminate the danger, taking into consideration all of the circumstances in this case.

In considering whether either of the defendants knew of an unjustifiable danger to Mr. Redmond, you may consider all evidence and make the inferences you deem proper as to the defendants' knowledge. Should you find that the danger posed to Mr. Redmond was obvious and undisputable, or evident and serious, you may take that into account in determining whether it would have come to the attention of someone in the position of either of the defendants.

By way of further explanation of this element and the duty I have defined, I charge you that the mere happening of an assault or rape occurring in a prison does not create liability. Nor does the mere fact that a prison official has super-

vision and control over a given area or a prison or system. There must be a degree of personal involvement that connects him to the claimed deprivation of a constitutional right.

The law recognizes also that public officials cannot lightly be held liable in damages for injuries that may be caused in the performance of their duties since it is important to the public that such officials be permitted to carry out their public duties without a constant fear of lawsuits and having to respond in damages. As a result the law says that public officials cannot be held liable for constitutional injuries which result from mere errors of judgment, inadvertence or carelessness. That is the reason then that the degree of fault as I advised you must amount to deliberate indifference or callous neglect as I have defined those terms for you."

475 F.Supp. at 1120 n. 8.

In *Redmond* a resident at Jackson brought an action against a number of its officials including a nurse-supervisor and the warden for damages suffered by a homosexual rape which occurred in the prison infirmary. The resident claimed, among other things, the nurse-supervisor was aware of the probable danger to him and was deliberately indifferent or callously neglectful and that the warden was aware of the severity, dimensions and details of the homosexual rape peril and that his responses were inadequate. While Judge Pratt's analysis of the law of "fault" in a § 1983 case related to a claimed Eighth Amendment right in *Redmond*, the Court finds nothing in the analysis to suggest that it ought not be applied to a Fourteenth Amendment right violation as is the case here; this even though Judge Pratt's instruction may apply a more severe test than necessary to establish personal responsibility. Additionally Judge Pratt's formulation deals directly with any claim of qualified official immunity, *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978):

"Since deliberate indifference is by definition outside the bounds of reasonable good faith behavior, once a plaintiff has shown that the defendants acted with deliberate indifference to his serious needs for personal safety then qualified immunity provides no further obstacle to recovery."

475 F.Supp. at 1119.

2.

Applying the Court's findings of fact to the standard articulated by Judge Pratt, the Court finds Jamrog and Sholes are each liable to Riley. More than an error of judgment, inadvertence or carelessness was involved with regard to the conduct of each of them.

Jamrog, as the Court has found, knew of Riley's illegal confinement and by his own admission was obligated to check the list maintained by Parcyck. While he asserted that he did check the list the Court finds that he did not. Had he done so he would have seen Riley's name was not on it and Riley would have been released ten days sooner. His failure to do so was more than negligence or carelessness.

Sholes likewise knew or should have known of Riley's illegal confinement. He had the obligation to supervise; he had the obligation to see to it that residents in 5 West were regularly reviewed as to status. Knowing the conditions at Jackson and knowing of the number of residents being held in 5 West contrary to the rules and regulations because of the crowded conditions obligated Sholes to regularly check the lists himself or to see that the list was regularly checked to assure each resident, including Riley, was moved out as expeditiously as possible and within the established priorities. While the Court accepts Sholes' statement that he would not have deliberately kept Riley off the rotation list, his failure to check the list effectively did so. *See Jerry v. Francisco*, 632 F.2d 252, 256–57 (3rd Cir. 1980) (Adams, J., concurring).

There is no more persuasive evidence of the egregious nature of Jamrog's and

Sholes' inattention to duty than the fact that when Riley finally got the attention the administration at the Department of Corrections he was immediately transferred to the general population. No case has been cited to support the proposition that prison officials directly responsible for custody and review of residents strictly confined under prison regulations can absolve themselves of § 1983 liability by demonstrating the resident was "lost in the shuffle".

## VIII.

### 1.

██ What remains is a determination of the damages suffered by Riley because of his ten days of illegal confinement. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), establishes the rule that in a § 1983 case a successful plaintiff is entitled to receive only nominal damages, not to exceed one dollar, from a defendant found liable absent proof of actual injury. Neither Riley's testimony nor the testimony of any witness supports a claim of any actual damages suffered by Riley other than emotional distress caused by an insult to his dignity occasioned by his illegal confinement.

### 2.

In *Simon, supra,* Judge Freeman assessed one dollar as nominal damages for what he found was a "right to adequate notice [that] was technically violated" and twenty-five dollars a day for each of thirteen days plaintiff spend in administrative segregation illegally under substantially the same circumstances as Riley. Riley certainly is entitled to no less for the emotional distress the Court concludes he suffered because of the insult to his dignity. Accordingly Riley may have a judgment for $250.00.

### 3.

The Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. § 1988, entitles Riley's attorney to a reasonable fee plus costs since Riley is the prevailing party in this case. The attorney's conclusionary request for $4,000.00 is an insufficient basis for action by the Court. *See Northcross v. Board of Education,* 611 F.2d 624 (6th Cir. 1979). Accordingly Riley's attorney shall have ten days to file a fee request after which defendants shall have ten days to respond. Oral argument will abide the request and response. To economize on judicial time entry of a formal judgment will be deferred until the attorney's fees are determined.

### IX.

While this case took only two days to try it took over four years to conclude; while the judgment is only $250.00 it is not a trivial case. As expressed by Justice Powell in his concurring opinion in *Parratt, supra*:

> "[§ 1983] was enacted to deter real *abuses* by state officials in the exercise of governmental powers. It would make no sense to open federal courts to lawsuits where there has been no affirmative abuse of power, merely a negligent deed by one who happens to be acting under color of state law."

451 U.S. at 549, 101 S.Ct. at 1920.

Jamrog's and Sholes' inaction was more than "merely a negligent deed", it was an "affirmative abuse of power". They knew of the crowded conditions; they knew residents committed to their charge were being confined illegally; they knew of the need to keep a meticulous check on the lists to avoid someone being "lost in the shuffle". The judgment here is in some measure the functional equivalent of the injunction in *Jackson, supra* and in keeping with the true purpose of an action for a constitutional tort envisioned by § 1983. *See* Whitman, Constitutional Torts, 79 *Mich.L.Rev.* 5 (1980).*

---

\* This opinion was written prior to release of the opinion of the Court of Appeals for the Sixth Circuit in *Wolfel v. Sanborn,* 666 F.2d 1005 (1981), which holds that it is the burden of the defendant in a § 1983 case to prove the defense of qualified immunity. Here, Sholes and Jamrog failed to carry the burden; the decision in

EXHIBIT A

## COMMISSION OF CORRECTIONS

### General Rules

### Part 4. Resident Classification and Transfer

R 791.4401 Security classification; criteria; security classification committee; levels of custody; additional criteria for certain classifications; right to hearing; reclassification; transfer; grievance.

Rule 401. (1) Each resident shall be classified according to his or her behavior, attitude, circumstances, and the likelihood that the trust implicit with the level of security prescribed will be honored. A security classification is not a punitive or disciplinary action on the part of the department. Residents shall be classified according to security requirements necessary for their protection, the safety of others, the protection of the general public, prevention of escape, and maintenance of control and order.

(2) Security classifications shall be determined at each institution by a committee authorized by the director.

(3) After examination by the classification committee of all information on the resident, the resident shall be assigned 1 of the following categories of security classification which is the least restrictive level of custody consistent with the requirements of subrule (1):

 (a) Administrative segregation, subject to R 791.4405.

 (b) Maximum custody.

 (c) Close custody.

 (d) Medium security.

 (e) Minimum security.

 (f) Community status.

. . . . .

R 791.4405 Administrative segregation status; criteria for imposition; hearing;

*Wolfel* supports the Court's analysis in Part VII, *supra*.

status review; monthly report; privileges; showers; daily inspection.

Rule 405. (1) Administrative segregation may be imposed only when:

 (a) A resident demonstrates inability to be managed with group privileges.

 (b) A resident needs protection from other prisoners.

 (c) A resident is a serious threat to the physical safety of staff or other residents or to the good order of the facility.

 (d) A resident is a serious escape threat.

(2) A resident shall be afforded an opportunity for a hearing pursuant to R 791.3315 before being classified to administrative segregation; however, a resident may be temporarily held in segregation status pending a hearing upon order of the institutional head, or at the resident's request. This temporary period may not exceed 4 weekdays.

(3) A resident classified to administrative segregation shall be interviewed and have his or her security status reviewed at least monthly.* This review shall be written, and a copy shall be given to the resident and to the security classification committee. The interviewers may initiate a request for security reclassification at any time that it appears that administrative segregation is no longer required in light of all of the following:

 (a) The resident's behavior and attitude in segregation.

 (b) Reappraisal of the circumstances necessitating segregation.

 (c) An evaluation of the resident's potential for honoring the trust implicit in a less restrictive status.

. . . . .

(5) A resident placed in administrative segregation shall be afforded all privileges that are administratively feasible and which can be safely allowed, including, but not

* This was twice monthly in April and May 1977.

limited to, participation in educational, religious, and treatment activities.**

(6) A resident in administrative segregation shall be afforded opportunity for at least weekly showers.

(7) Department staff shall daily inspect each administrative segregation unit and visit each resident so segregated. A record shall be maintained of all such inspections and visits.

## EXHIBIT B

### EXCERPTS FROM THE TRANSCRIPT OF THE TESTIMONY OF DAVID JAMROG

"Q. At the time that he was on 5 West, did he advise you of the fact that he had been found not guilty?

A. Yes, he did."

. . . . .

"Q. Assume, if you will, that Mr. Riley, when he told you of his continued detention, did show you that document, what would you have done?

(page 15)

. . . . .

A. As I have already indicated, I would have made note of it and brought it to the attention of the Housing Deputy's Administrator to see where we were at in terms of a release list.

Q. Do you recall doing that in this instance?

A. Yes, I do.

Q. And whose attention did you bring it to?

A. Mr. Parcyck."

(page 16)

. . . . .

"Q. When you became aware of the complaint of Jimmie Lee Riley, did you check or attempt to determine whether he was on the so-called rotation list?

** Participation in these activities was not allowed residents of 5 West in April and May

A. . . . I brought that information to Mr. Parcyck's attention and what he did with it from there I don't know."

(page 30)

. . . . .

"Q. . . . On Page 6 of the deposition of Mr. Jamrog at the bottom of the page the question to you was:

'Q. As a Deputy working on the floor at that time, did you have a responsibility to bring this to Deputy Sholes' attention?'

Referring to the plight of Mr. Riley.

'A. Yes.

'Q. Did you bring this to Deputy Sholes' attention?

'A. Yeah, I'm certain that I did, that he was on a release status awaiting a cell, yeah.' "

(pages 31–32)

. . . . .

"Q. I would like to refer to your deposition, page nine.

'Q. Did Jimmie Lee Riley complain to you personally about the fact that he was being detained on 5 West despite the fact that he had been found not guilty of the charges?

'A. Yes.

'Q. Do you recall how many times he complained to you?

'A. No.

'Q. Was it a number of times?

'A. I don't recall.

'Q. More than once?

'A. Possibly, yes.

'Q. What did you do in response to those complaints?

'A. As I would, for any individual that made—brought that concern to my attention, I would check the list in the Deputy's Office to be sure that he's on the list, or check his file to see that he was on a release status. I did one or the other. I'm not sure.' "

(pages 46–47)

. . . . .

1977.

"Q. Is it your position still that Jimmie Lee Riley was on 5 West for 41 days, 42, or 41, depending on how you count, because of a backlog?

A. Well, after what I have heard in the last two days, I think he was there because he got lost in the shuffle.

Q. So in June of 1977 you believed that it was the backlog, but today you believe it was the shuffle?

A. It's very difficult to sit here today and talk about what I believed in 1977. If that document indicates that then I have to assume that that was my feeling at the time."

(pages 73–74)

. . . . .

"THE COURT: Isn't it likely then that the reason Mr. Riley stayed in 5 West until May 20th is because his name was not on the list in the Housing Office?

A. Yes sir, I believe that to be true."

(page 85)