Wendell Shane **MACKEY**,
Plaintiff–Appellant,

v.

Dennis **DYKE**, Assistant Deputy Director
of the Bureau of Correctional Facilities,
Michigan Department of Corrections, et
al., Defendants–Appellees.

No. 93–1891.

United States Court of Appeals,
Sixth Circuit.

Argued April 26, 1994.

Decided July 21, 1994.

---

Paul D. Reingold, Michigan Clinical Law Program, Ann Arbor, MI (argued and briefed), for plaintiff-appellant.

Luann Cheyne Frost (briefed), Katharyn A. Barron (argued), Office of Atty. Gen., Corrections Div., Lansing, MI, for defendants-appellees.

Before: GUY and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

The question in this case is whether Michigan prison officials violated an inmate's due process rights by failing to return the inmate promptly to the general prison population from administrative segregation after determining that he was no longer subject to segregation. The district court held that Michigan prison rules and regulations do not create a liberty interest in an inmate's right to release from segregation that is protected by the Due Process Clause of the Fourteenth Amendment. The district court also held that even if the inmate had such a liberty interest he received the process he was due, and further, that the defendant prison officials were entitled to qualified immunity. The district court granted the defendants' motion for summary judgment and dismissed the action. We reverse and remand for further proceedings.

## I.

### A.

Wendell Shane Mackey is a prisoner in the custody of the Michigan Department of Corrections (MDOC). In July of 1988, Mackey was housed at the State Prison of Southern Michigan. On July 7, 1988, Mackey was found guilty of misconduct for possession of illegal contraband and for assaulting another prisoner; he was consequently reclassified to administrative segregation. One month later, he was transferred to the Huron Valley Men's Facility, where he remained in administrative segregation until August 17, 1989.

During this segregation period, the MDOC staff filed monthly reviews concerning Mackey. Each review from September 1988 through February 1989 recommended that Mackey continue in segregation because he presented a danger to other prisoners or staff. In March 1989, reviewing officer Smith recommended that Mackey be released to the general population. The Security Classification Committee (SCC) denied this recommendation and ordered that Mackey continue in segregation. In Smith's April 20, 1989 report, he suggested "release at transfer to general group facility." The SCC accepted this recommendation, and defendant Brown wrote "reclassify upon transfer" in the section of the form titled "Security Classification Committee Action."

Although the recommendation to reclassify had been approved, Mackey was not immediately transferred. In fact, he remained in segregation for an additional 117 days. His monthly reviews continued; each review, however, simply stated that Mackey had either been "released from segregation" on April 20 and that transfer was "pending," or that he had been "released pending transfer."

On June 6, 1989, Warden Miller wrote a letter to Mackey, stating that Mackey had been recommended for reclassification and that he would be transferred when bed space was available. On June 13, 1989, however, a transfer order was prepared requesting that Mackey be transferred "to a general group facility to make room for a[n] Administrative Segregation prisoner."

Mackey filed a grievance, asking that his transfer to the general population not be delayed any further. On June 21, 1989, defendants Watson and Brown sent Mackey a response, stating that

Although you have been released from Ad. Seg., the only facility your [sic] are eligible to transfer is Marquette and SMM. Currently, there is a problem with bed space throughout the department. Until there is space available we are unable to transfer you.

On August 16, 1989, Mackey's transfer order was processed and he was released into the general population at Marquette Branch Prison on the following day.

### B.

On August 15, 1992, Mackey filed this action under 42 U.S.C. § 1983 alleging that the defendant employees of the MDOC violated his constitutional right to due process by failing to reclassify him after he was released from segregation. Mackey sued the MDOC employees in both their individual and official capacities.

The defendants filed a motion to dismiss or alternatively for summary judgment. A hearing was held before a magistrate judge, who recommended that the defendants' motion for summary judgment be granted. Although Mackey's complaint alleged that two

prison regulations, Michigan Administrative Code Rules 791.4401 and 791.4405 (hereafter Rules 401 and 405), together create a liberty interest in release from administrative segregation, the magistrate judge considered only Rule 401. The magistrate judge also cited *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), in support of her conclusion that if Mackey had a liberty interest in being released, certain postdeprivation legal procedures available under Michigan law would satisfy any due process rights flowing from the inmate's continued confinement in segregation.

Overruling Mackey's specific objections, the district court accepted the magistrate judge's report and recommendation as the court's findings and conclusions and entered judgment accordingly.

### II.

Mackey does not dispute the propriety of his initial confinement to segregation. He was given a hearing and found guilty of major misconduct. Furthermore, Mackey admits that he was rightfully confined in segregation until April 20, 1989. The MDOC staff believed that Mackey presented a danger to the other prisoners and therefore could not be released into the general population. Mackey does not contest this belief. Mackey does, however, maintain that after April 20, 1989, he no longer qualified for confinement in administrative segregation. The reviewing staff apparently agreed. Therefore, Mackey claims, he had a right to be released and, by failing to do so, the MDOC defendants denied him due process of law.

### A.

■ Although the Constitution does not make an inmate's freedom from segregation a protected liberty interest, *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), a state may create such a liberty interest through statutes, rules and regulations, or policies. *Hewitt v. Helms*, 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983). Writing for the Supreme Court in *Olim v. Wakinekona*, 461

U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), Justice Blackmun stated that

> a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," the State has not created a constitutionally protected liberty interest.

*Id.* at 249, 103 S.Ct. at 1747 (quoting *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring)).

The court has interpreted these requirements as follows:

> In determining whether state-enacted rules create a protected liberty interest, the key is "whether or not the state has imposed 'substantive limitations' on the discretion of [officers] ... or, in other words, whether the state 'has used language of an unmistakably mandatory character.'" The *mandatory* nature of the regulation is the key, as a plaintiff "must have a legitimate claim of entitlement to the interest, not simply a unilateral expectation of it."

*Washington v. Starke,* 855 F.2d 346, 349 (6th Cir.1988) (alteration in original) (citations omitted). The Supreme Court has cautioned that not all mandatory language in prison regulations can fairly be held to create liberty interests. In *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), the Court summarized the necessary elements for finding that state statutes and regulations create inmate liberty interests protected by the Due Process Clause.

In sum, the use of "explicitly mandatory language," in connection with the establishment of "specified substantive predicates" to limit discretion, forces a conclusion that the State has created a liberty interest.

*Id.* at 463, 109 S.Ct. at 1910 (quoting *Hewitt v. Helms,* 459 U.S. at 472, 103 S.Ct. at 871). The Court then proceeded to sound a caution against an overly expansive treatment of the "mandatory language" requirement:

> It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for any imperative that might be found. The search is for relevant mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether an inmate may be deprived of the particular interest in question.

*Id.* 490 U.S. at 464 n. 4, 109 S.Ct. at 1911 n. 4.

■ From these various formulations of the requirements we conclude that in order to create a protected liberty interest, a statute, rule or regulation must use explicitly mandatory language that establishes "specific substantive predicates" which limit official discretion by mandatorily requiring specific action by the responsible officials once the substantive predicates are found to be in place.

### B.

■ We examine Rules 401 and 405 in light of these guiding principles.

Rule 401, as modified by Emergency Rule 1,[1] provides for security classification of prisoners within the Michigan penal system. Each prisoner must be classified following listed criteria such as behavior, attitude and trustworthiness. Emergency Rule 1(1) provides that residents may be classified according to security requirements necessary for their protection, the safety of others, the

---

1. The MDOC Emergency Rules went into effect on October 3, 1988. These rules were enacted in response to severe inmate disciplinary problems, including the homicide of two corrections officers. These rules, which gave MDOC officials additional leeway in prison management, superseded then-existing Rules 401, 513, 621, 637 and 639 of the Michigan Administrative Code. They did not affect Rule 405. Although the Emergency Rules were not in effect at the time of Mackey's initial confinement in administrative segregation, they were in place at the time of the defendants' allegedly unconstitutional conduct, i.e. between April and August of 1989.

protection of the general public, prevention of escape, and maintenance of control and order. Emergency Rule 1(3) requires that each inmate be assigned to one of six listed categories of security classifications "which is the least restrictive level of custody consistent with the requirements of subrule (1)" described above. The most restrictive category listed is "Segregation, subject to the provisions of R[ule] 791.4405." Emergency Rule 1(3)(a).

Rule 405 lists the criteria and procedures for imposition of administrative segregation and requirements for periodic status review and monthly reports. Relevant to our inquiry are Rule 405(2) and (3):

> (2) A resident shall be afforded an opportunity for a hearing pursuant to R 791.-3315 before being classified to administrative segregation; however, a resident may be temporarily held in segregation status pending a hearing upon order of the institutional head, or at the resident's request. This temporary period may not exceed 4 weekdays.
>
> (3) A resident classified to administrative segregation shall be interviewed and have his or her security status reviewed at least monthly. This review shall be written, and a copy shall be given to the resident and to the security classification committee. The interviewers may initiate a request for security reclassification at any time that it appears that administrative segregation is no longer required in light of all of the following:
>
> (a) The resident's behavior and attitude in segregation.
>
> (b) Reappraisal of the circumstances necessitating segregation.
>
> (c) An evaluation of the resident's potential for honoring the trust implicit in a less restrictive status.

It is clear that both Rule 401, as modified by Emergency Rule 1, and Rule 405 are replete with mandatory language. The imperative "shall" appears over and over in describing the duties of prison officials. The question is whether this mandatory language is used in such a way as to restrict official discretion by requiring officials to apply "certain substantive predicates" in making decisions.

## III.

### A.

Before the Supreme Court defined the issue clearly in *Hewitt, Olim* and *Thompson,* this court dealt with the due process right of prison inmates not to be denied favorable living conditions as follows:

> Where statutes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits or favorable living conditions enjoyed by a prisoner, an expectation or entitlement has been created which cannot be taken away without affording the prisoner certain due process rights. On the other hand, when prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created.

*Bills v. Henderson,* 631 F.2d 1287, 1292–93 (6th Cir.1980).

In more recent cases we have applied the later Supreme Court holdings to specific questions posed by particular state statutes and regulations. In *Beard v. Livesay,* 798 F.2d 874 (6th Cir.1986), Tennessee officials argued that the state's reclassification system contained only procedural rules, and thus created no protected liberty interests. The court, relying primarily on *Hewitt,* disagreed, stating that although "procedural safeguards alone cannot create a protectible liberty interest," very detailed procedural requirements in combination with substantive limitations are sufficient to create such an interest. *Id.* at 878.

In another case from Tennessee, *Childs v. Pellegrin,* 822 F.2d 1382 (6th Cir.1987), we addressed the very issue raised by this appeal. In *Childs* the inmate plaintiff was kept in administrative segregation after being cleared of charges that supported initial placement in that restrictive level. Finding that the plaintiff had been retained in segregation long after the justification expired, the court stated that "[t]here is little difference between depriving a person of liberty without

due process of law, on the one hand, and failing to restore someone's liberty after any legal justification for its deprivation has been eliminated, on the other hand." *Id.* at 1388.

## B.

We now examine cases from Michigan dealing with Rules 401 and 405.

The magistrate judge found that Mackey had no state-created liberty interest in being released from administrative segregation. Relying primarily on this court's decision in *Newell v. Brown*, 981 F.2d 880, 884 (6th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 127, 126 L.Ed.2d 91 (1993), the magistrate judge found that Rule 401, as modified by the Emergency Rules, did not establish a liberty interest. The magistrate judge noted that the language of Emergency Rule 1, which deals with the classification of prisoners into particular security levels, includes " 'a non-exclusive listing of factors consideration of which was permissive, not mandatory.' [*Newell*, 981 F.2d] at 884." Furthermore, Policy Directive PD–DWA 30.02, which was also considered by the *Newell* court, states that "there is no intrinsic right to placement at a particular level" and that "the least restrictive form of control consistent with these requirements shall be utilized with available bed space."

If Mackey were relying on Rule 401 alone, *Newell* would be dispositive. That is not the case, however. Both in his complaint (paragraph 51) and in his brief opposing the defendants' motions for dismissal or summary judgment, Mackey specifically charged that the defendants failed to follow the mandates of both rules and that this failure resulted in a due process violation.

Turning to the language of Rule 405, we find that segregation may be imposed *only* under the listed circumstances; a hearing *shall* be afforded prior to reclassification; and residents *shall* be reviewed monthly. Accordingly, prior panels of this court have held that Rule 405 creates a limited liberty interest. In *Walker v. Mintzes*, 771 F.2d 920

(6th Cir.1985), the court of appeals affirmed the district court's holding that under Rule 405 an inmate has a liberty interest in not being transferred to administrative segregation without a hearing. The district court had held that "[a]n inmate enjoys a liberty interest in that he cannot be assigned to administrative segregation unless he warrants such assignment on the basis of conduct specified in the statute, policy directive or regulation." 544 F.Supp. 345, 352 (E.D.Mich.1982).

The court went one step farther in *Howard v. Grinage*, 6 F.3d 410 (6th Cir.1993). In *Howard* the inmate, who had asked for protective custody, was mistakenly transferred to a different institution and again placed in protective custody even though he had signed a waiver requesting return to general prison population following a psychiatric evaluation. Upon learning of the error, prison officials transferred the inmate back to his original prison but kept him in protective custody. The inmate had not requested continued protective custody; in fact, he had asked repeatedly to be reclassified to the general population. The inmate was given monthly reviews, and several recommendations that he be reassigned to the general population were ignored. The inmate was finally released fifteen months after the first such recommendation.

The court divided Howard's claim into two issues: (1) whether Howard was denied due process when he was placed in protective custody for the second time; and (2) whether Howard was denied due process when his confinement was continued after the reasons for confinement no longer existed. The court, citing *Walker*, recognized that Howard had a liberty interest in being free from segregation absent a hearing.[2] The court further interpreted *Walker* as holding that "[c]ontinued confinement in protective custody after the reasons for such segregation no longer exist could constitute a violation of plaintiff's liberty interest...." 6 F.3d at 412. On the issue of continued confinement,

---

**2.** The Emergency Rules were not in effect, and the court found that the inmate had a liberty interest under Rule 401 in his security classification. This finding does not conflict with *Newell* because the Emergency Rules, which place greater discretion in MDOC officials, were no longer in effect at the time of *Howard*.

this court remanded the case to the district court to determine if the conduct of the MDOC officials rose to the level of gross negligence or deliberate indifference necessary to trigger liability under § 1983, and if so, to award damages.

In *Riley v. Johnson*, 528 F.Supp. 333 (E.D.Mich.1981), the district court (Avern Cohn, J.) ruled that Rules 401 and 405 created a constitutional right for an inmate, once cleared of charges that led to administrative segregation, to be returned to the general prison population. *Id.* at 340. Judge Cohn found that the Michigan rules, similar to those of Tennessee previously construed by this court, limited the discretion of prison officials regarding administrative segregation. Once the reason for the inmate's being in segregation expired, the only way the prison officials could continue him there would be by following all of the required procedures for placing him there in the first place. *Id.*

The cases just cited involved inmates who were eventually cleared of the charges that caused them to be placed in administrative segregation, while Mackey concedes that his original placement there was proper. Nevertheless, the ultimate question in this case is the same as that in *Childs* and *Riley:* does an inmate have a protected liberty interest in being released from segregation once the reason for the original placement expires? It makes no difference whether the justification disappears because the inmate is cleared of the original charges or because he has demonstrated by "behavior and attitude" while in segregation a "potential for honoring the trust implicit in a less restrictive status." Rule 405(3)(a) and (c).

### IV.

#### A.

We conclude that the district court committed clear error in failing to consider Rule 405 and thus holding that Michigan regulations create no protected liberty interest in an inmate's right to release from administrative segregation once the conditions that justified his placement there no longer exist. Although Rule 405 contains some precatory

language ("The interviewers may initiate a request for security reclassification at any time"), once it has been determined that an inmate is entitled to be reclassified and released, prison officials are not permitted to keep him there without instituting new charges and following all the procedures required for placing him there originally. Of course, although the defendants were required to reassign Mackey to the general population when no reason existed to keep him in segregation, they could hold him in segregation until bed space was found.

Having failed to consider Rule 405 at all and concluding that Rule 401 did not create the asserted liberty interest, the district court did not reach the merits of Mackey's claim. Upon remand the district court must conduct a hearing and determine whether the defendants can establish their claim that Mackey was held in segregation because of lack of bed space in the general population. The very records submitted by the defendants cast serious doubt on this attempted justification for Mackey's retention there. The transfer order that ultimately led to Mackey's release stated that "[t]his transfer is being requested to send Mackey to a general population facility to make room for a[n] Administrative Segregation prisoner." This issue of material fact made entry of summary judgment for the defendants improper. FED. R.CIV.P. 56(c).

Upon remand the district court will make factual findings concerning the available bed space in the Michigan institutions. If the court finds that there was in fact available bed space, then the court must also determine whether the defendants' failure to procure that space for Mackey was the result of willful and wanton behavior. As the magistrate judge correctly noted, Mackey did not allege that the defendants' actions were deliberate, and mere negligence is not sufficient to support a § 1983 claim. *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). Mackey did allege, however, that the "[d]efendants acted willfully and wantonly in failing to remove plaintiff from administrative segregation until August 17, 1989, in violation of R 791.4401 and R 791.4405." (Complaint, para-

graph 59). Willful and wanton behavior amounting to deliberate indifference to the rights of a person in custody is sufficient basis for a claim under § 1983. See *Howard v. Grinage,* 6 F.3d 410 (6th Cir.1994); *Fagan v. City of Vineland,* 22 F.3d 1296, 1305–06 (3d Cir.1994).

### B.

■ One further comment is required with respect to this aspect of the case. The magistrate judge's report, accepted by the district court, appears to rely on *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), as a basis for dismissing Mackey's complaint. This, too, was error. *Parratt* permits dismissal of procedural due process claims brought under 42 U.S.C. § 1983 in a limited set of circumstances based on the fact that the state provides the claimant an adequate postdeprivation remedy. *Parratt* does not require dismissal of all § 1983 actions where the state provides a postdeprivation process for remedying the alleged deprivation. The Supreme Court explained the limitations on *Parratt* in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), stating that the *Parratt* doctrine will defeat a procedural due process claim only if: (1) the deprivation was unpredictable or "random"; (2) predeprivation process was impossible; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty. 494 U.S. at 136–39, 110 S.Ct. at 988–90. In such a case, "the state cannot be required constitutionally to do the impossible by providing predeprivation process." *Id.* at 129, 110 S.Ct. at 985. The controlling inquiry is whether the state was in a position to provide for predeprivation process. *Hudson v. Palmer,* 468 U.S. 517, 534, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984); *Macene v. MJW, Inc.,* 951 F.2d 700, 705–06 (6th Cir. 1991). See also *Harris v. City of Akron,* 20 F.3d 1396 (6th Cir. 1994) ("The touchstone of the *Parratt* rule is the impossibility or impracticability of providing predeprivation process combined with provisions for adequate postdeprivation process."). Given the record in this case, it cannot be said that it would have been either impossible or impracticable for the defendants to have provided predeprivation process. At any time after officer Smith's first recommendation in March 1989 that Mackey be returned to the general population, the SCC could have provided a hearing under Rule 791.3310 to determine if Mackey should remain in administrative segregation. Instead, the SCC accepted Smith's recommendation at the April 20 review that Mackey be returned to the general population. But, the defendants did nothing despite the fact that no review after April 20 showed any reason for keeping Mackey segregated and, in fact, every review indicated that he had been "released." Certainly, if the defendants disagreed with the April 20 action, there was no obstacle to providing Mackey an immediate hearing to determine if he should remain in segregation.

Just as she failed to consider Rule 405, the magistrate judge failed to consider *Zinermon* or *Hudson.* It was error to apply *Parratt* without reference to the limitations the Supreme Court has placed upon its application.

### V.

The district court also accepted the magistrate judge's recommendation that the defendants were entitled to dismissal on the basis of qualified immunity. After finding that Mackey had established no constitutional violation, the magistrate judge found that even "[i]f a constitutional violation were stated, defendants would clearly be entitled to qualified immunity." We do not find the issue so clear.

### A.

■ Because qualified immunity is a legal issue, *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988), we review the district court's ruling de novo. *Walton v. City of Southfield,* 995 F.2d 1331, 1335 (6th Cir.1993).

■ Generally, officials have qualified immunity from individual liability for damages that have resulted from exercising discretionary functions. *Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir.1993); *Walton,* 995 F.2d at 1335–36. However, this liability protects those officers only "insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

▉ This issue in this case is whether Mackey had a "clearly established" right to be free from segregation. In order for a right to be "clearly established," the law must be clear with regard to the official's particular action in the particular situation. As the Supreme Court stated in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987):

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039 (citation omitted). Whether the official was or should have been aware of the constitutional right does not turn on the subjective good faith of that official, but rather turns on the "objective reasonableness" of the action, assessed in light of the legal rules that were in effect at the time the action was taken. *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39; *Mumford,* 4 F.3d at 432; *Long v. Norris,* 929 F.2d 1111, 1114–15 (6th Cir.), *cert. denied,* ── U.S. ──, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991).

In determining the state of the "clearly established" law in a given situation, we "look first to the decisions of the Supreme Court, then to decisions of this court and other courts within this circuit, and finally to the decisions of other circuits." *Masters v. Crouch,* 872 F.2d 1248, 1251–52 (6th Cir.), *cert. denied sub nom. Frey v. Masters,* 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989).

### B.

Relying primarily on *Rich v. City of Mayfield Heights,* 955 F.2d 1092 (6th Cir.1992), the magistrate found that Mackey's right to be released from segregation had not been clearly established and therefore the defendants could not have known that their actions were unconstitutional. We have no quarrel with the general principles stated in *Rich,* but find that *Rich* does not lead to the conclusion that the defendants in this case were entitled to qualified immunity. *Rich* involved a claim that jail officials failed to provide the proper form of emergency care when an inmate was found hanging in his cell. The question was not whether the officials had a duty to render emergency aid, but whether the steps they took were the proper ones. The *Rich* court held, correctly we believe, that the "particularized" right being claimed was not clearly established. That is not the case with respect to retention in administrative segregation under the conditions of Mackey's continued confinement.

The "particularized" right that Mackey is claiming is the right not to be arbitrarily kept in administrative segregation for 117 days after the reason for his original confinement there expired. The Supreme Court stated in *Hewitt v. Helms,* 459 U.S. 460, 477 n. 9, 103 S.Ct. 864, 874 n. 9, 74 L.Ed.2d 675 (1983), that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate." In *Childs v. Pellegrin,* 822 F.2d 1382, 1388 (6th Cir.1987), we stated that "[t]here is little difference between depriving a person of liberty without due process of law, on the one hand, and failing to restore someone's liberty after any legal justification for its deprivation has been eliminated, on the other hand." A district court within this circuit concluded in 1981 that prison officials denied an inmate's right to due process by failing either to return him promptly to the general population or to follow the same procedures for placing him there originally if they decided not to release him. *Riley v. Johnson,* 528 F.Supp. 333, 340 (E.D.Mich.1981). See also *Butts v. Dutton,* 878 F.2d 1436 (6th Cir.1989) (table) (text at 1989 WL 73653, 1989 U.S.App. LEXIS 9754) (Right of inmate not to be confined arbitrarily in administrative segregation after reason for confinement no longer existed has been "clearly established" at least since *Hewitt* ).

### C.

Mackey is claiming that his retention in administrative segregation was arbitrary. If

the district court determines that there was available bed space at the time the SCC approved Mackey's release from segregation, then his continued confinement was based on a pretext. So far as this record shows, Mackey would have remained in segregation indefinitely except for his continuing grievances and complaints. The right not to be so confined indefinitely was clearly established by the controlling decisions cited above.

█ Although the defendants bear the initial burden of coming forward with facts that show they were acting within their discretionary authority at the time in question, the "'ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity.'" *Washington v. Newsom*, 977 F.2d 991, 995 (6th Cir.1992) (quoting *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1848, 123 L.Ed.2d 472 (1993). However,

> summary judgment would not be appropriate if there is a factual dispute (i.e. a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.

*Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). See also *Black v. Parke*, 4 F.3d 442, 450 (6th Cir.1993) (summary judgment on qualified immunity issue inappropriate where there was issue of fact as to whether inmate received process due under *Hewitt* ).

Because the question of whether bed space for Mackey was available in the general prison population is material and is as yet unanswered, the district court erred in finding that the defendants were entitled to qualified immunity when it ruled on the defendants' motion for summary judgment.

The judgment of the district court is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.