Gregory HOWARD, Plaintiff–Appellant,

v.

Herbert GRINAGE; Dan Bolden; James Stegal; and Kenny Robinson, Defendants–Appellees.

No. 92–1268.

United States Court of Appeals, Sixth Circuit.

Argued and Submitted May 6, 1993.

Decided Oct. 1, 1993.

Daniel E. Manville, Detroit, MI (briefed), for plaintiff-appellant.

E. Michael Stafford, Asst. Atty. Gen., Corrections Div. (argued and briefed), Keith D. Roberts, Asst. Atty. Gen., Lansing, MI, for defendants-appellees.

Before: MARTIN and BOGGS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

KRUPANSKY, Senior Circuit Judge.

Plaintiff–Appellant, Gregory Howard, has appealed the district court's summary judgment in favor of the defendant prison officials in this prisoner civil rights action filed under 42 U.S.C. § 1983. Howard's claims have been previously considered by this court in *Perry v. Foltz*, 860 F.2d 1080 (6th Cir.1988)

(unpublished per curiam). In that case, the court affirmed the district court's grant of summary judgment dismissing plaintiff's claims charging denial of access to the courts and inadequate living conditions. It reversed the summary judgment dismissing his two remaining claims, concluding that genuine issues of material fact existed concerning whether defendants had been deliberately indifferent to plaintiff's safety and whether plaintiff's continued confinement in administrative segregation constituted a deprivation of his liberty interest. After a four-day bench trial on remand, Howard charged in post-trial briefs that he had been denied his right to due process because his custody classification level had been increased from a close to maximum custody classification without notice, a hearing or a written waiver; and because of his continued confinement in administrative segregation after the reason for such incarceration no longer existed. The trial court issued a written opinion in which it concluded that plaintiff had not been deprived of his due process rights and was therefore not entitled to compensatory or nominal damages under § 1983.

Howard has been a long term inmate of the Michigan Department of Corrections (MDOC), serving a fifteen to thirty year prison term as an habitual offender. The defendants are various prison officials within the MDOC: Dan Bolden, Deputy Director, MDOC; Herbert Grinage, Deputy Warden, State Prison of Southern Michigan (SPSM); James Stegal, Assistant Deputy Warden, Riverside Correctional Facility (RCF); Kenny Robinson, Assistant Deputy Director, Huron Valley Men's Facility (HVMF). Bolden was responsible for resident transfers during the time in question and the remaining three defendants were responsible for resident classification at their respective institutions.

In April 1986, Howard was an inmate at Jackson Prison, SPSM, where he had signed a waiver for placement into protective custody to isolate himself from asserted enemies in the general prison population. On May 13, 1986, he was transferred to RCF for a psychological evaluation. At defendant Bolden's request, Howard was assigned to the general prison population at RCF, after signing a waiver verifying that he no longer had any existing dispute with a previously listed potential enemy. On June 11, 1986, Howard was transferred from the general prison population at RCF, a close custody facility, to protective custody at HVMF, a maximum security institution. The required notice and hearing to change Howard's custody status from a close to a maximum classification and placement had not been accorded him, nor had the required notice and hearing been provided to move him from the general prison population to protective custody.

The transfer to the maximum custody institution, HVMF, was a mistake that was corrected upon discovery and Howard was then transferred to SPSM. At trial, Bolden testified that Howard initially had been transferred from SPSM to RCF in order to undergo a psychological evaluation and that he should have been returned immediately to SPSM after the medical treatment instead of being transferred to HVMF. Upon his return from HVMF to SPSM, Howard was again placed in protective custody without receiving a notice and hearing, or signing a waiver authorizing prison officials to implement such action without a required hearing. The transfer order from HVMF to SPSM, however, noted that Howard had identified numerous enemies at SPSM, which had prompted his placement into protective custody during a previous period of confinement at that institution. *J.App.* at 175. The first bi-monthly report on Howard's administrative segregation[1] status dated August 6, 1986, also indicated that enemies in the general prison populace had been the reason for his continued segregation.

Beginning on August 20, 1986, Howard's administrative segregation status reports began to reflect his desire to be reassigned to the general prison population. The report on August 20 contained a statement that he desired to return to the general prison population and a request to confer with the Security Classification Committee (SCC). Subsequent reports on September 6 and 20 dis-

---

1. Protective custody or segregation is included within the overall category of administrative segregation and is governed by Michigan Administrative Code, R. 791.4405.

closed similar requests. In the October 6, report Howard asked to be transferred to "medium" status and the report noted that his segregation status would be screened on the next review date. Howard continued to request meetings with the SCC and on December 21, his status report reflected a clear desire to be returned to the general prison population. This status report recommended that Howard's segregation status be reduced and that he be transferred to the general prison population. Defendant Grinage, deputy warden of SPSM, as an acting member of the SCC, initialed all of the foregoing reports. Howard, however, was not released into the general population, despite the recommendation dated December 21, 1986.

A comment on Howard's January 4, 1987, status report recommending a reduced status was again ignored and he remained in protective custody. The bi-monthly status reports for the remainder of 1987 continued to manifest Howard's desire to meet with the SCC. These reports noted "no comment" in the space allocated to listing the reasons for his continued segregation. *J.App.* at 195. Despite Howard's clearly expressed desire to return to the general prison population, he was never returned to the general prison population during his entire stay at SPSM through March 3, 1988.

In addition to the written evidence, Howard testified at his trial that when he returned to SPSM from his psychological evaluation, he wanted to be reassigned to the general prison population despite his known enemies. He testified that he had talked with Grinage and Robin Pratt, Resident Unit Manager, on several occasions concerning his release from protective custody.

These two incidents (the increase in security classification level and the continued confinement in protective custody) are the basis for Howard's two due process claims. The district court concluded that Howard's liberty interests had not been violated and ruled in favor of the defendant prison officials.

█ Although prison inmates have no inherent due process right to have their security level downgraded or to be released from protective custody upon request, administrative rules and regulations may create such a guaranteed liberty interest. In *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), the Supreme Court decided that when a state adopts mandatory procedural guidelines for prison administration, a liberty interest is created: "on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *See also, Beard v. Livesay,* 798 F.2d 874, 877 (6th Cir.1986) ("Prison officials may ... create liberty interests by policy statements, regulations, or other official promulgations"). This court has previously recognized that the language of the Michigan Administrative Code, R. 791.4405 which addresses administrative segregation created a limited liberty interest. *Walker v. Mintzes,* 771 F.2d 920 (6th Cir.1985). This regulation limits the conditions under which an inmate can be placed into administrative segregation and the procedures to be implemented when an inmate has been segregated from the general prison population. Hence, the mandatory language of R. 791.4405 and the substantive limitations imposed on an institution's ability to segregate its inmates creates a protected liberty interest. *Beard,* 798 F.2d at 878. Continued confinement in protective custody after the reasons for such segregation no longer exist could constitute a violation of plaintiff's liberty interest as recognized by this circuit in *Walker.*

█ This circuit has not, however, to this date, determined whether Rule 791.4401 of the Michigan Administrative Code relating to security classification creates a protected liberty interest. The regulation provides that:

(1) Each prisoner **shall** be classified according to his or her behavior, attitude, circumstances, and the likelihood that the trust implication with the level of security prescribed will be honored.... A prisoner **shall** be classified according to the security requirements necessary for the following:

(a) The prisoner's protection.

(b) The safety of others.

(c) The protection of the general public.

(d) Prevention of escape.

(e) Maintenance of control and order.

.    .    .    .    .

(3) After examination by the classification committee of all information concerning the prisoner, the prisoner **shall** be assigned 1 of the following categories of security classification which is the **least restrictive** level of custody consistent with the requirements of subrule (1) of this rule.
(a) Segregation, subject to R 791.4405

(b) Maximum custody

(c) Close custody

(d) Medium security

(e) Minimum security

(f) Community status ...

(4) A prisoner being considered for reclassification to a more restrictive level of security, except segregation, **is entitled to an opportunity for an hearing** pursuant to R 791.3310, except as provided in subrule (5) of this rule. Classification to segregation is governed by R 791.4405.

(5) A prisoner is not entitled to a hearing where a more restrictive security classification is necessitated by a transfer made for 1 or more of the following reasons:

.    .    .    .    .

(c) Appropriate medical treatment cannot be obtained at the transferring facility....

*J.App.* at 151 (emphasis added). Given the regulation's mandatory language as well as its similarities with the regulation addressing administrative segregation in the same administrative code and its similarity with the Tennessee regulation which this circuit has found to create a liberty interest in Beard, this court concludes that Rule 791.4401 creates a liberty interest as it applies to security level classifications. Accordingly, an increase in plaintiff's security classification level without notice and hearing could under certain circumstances constitute a violation of plaintiff's liberty interests.

■ On appeal, Howard challenged the district court's findings of fact which concluded that no violation of his liberty interests occurred. This court reviews the district court's findings of fact under a clearly erroneous standard. *United States v. Roberts,* 986 F.2d 1026, 1029 (6th Cir.1993). Howard challenged the district court's finding that he was transferred from RCF, a close custody facility, to the higher custody classification level at HVMF, a maximum level facility, for medical reasons. Howard also disputed the district court's finding that despite his numerous requests, he was, in reality, not serious about being released from protective custody at SPSM.

In deciding that Howard suffered no deprivation of his liberty interest when he was transferred from RCF to HVMF, the district court concluded that

> On June 11, 1986, Howard was a resident of RCF, a close custody facility. Medical personnel of the MDOC recommended he be given a psychological evaluation. Bolden, acting on the recommendation ordered Howard transferred to HVMF, a maximum custody facility.

*J.App.* at 24. Whether or not Howard was transferred for medical reasons is crucial since Rule 791.4401, *supra,* excludes the necessity for notice and a hearing prior to an inmate's transfer only if "appropriate medical treatment cannot be obtained at the transferring facility...." Rule 791.4401(5)(c). The finding that Howard was transferred from RCF to HVMF for the purposes of a psychological evaluation is not supported by the record and is clearly erroneous. At trial, Bolden testified that Howard had been transferred to RCF for psychological evaluation. The subsequent order transferring Howard from RCF to HVMF indicates that the psychological evaluation had already been performed, thus, this transfer could not have been for the purposes of a psychological evaluation as found by the district court. *J.App.* at 174. The only other medical reference in the transfer order to HVMF directed that Howard continue his psychological therapy which was available to him at HVMF. The fact that Howard could receive counseling at HVMF, however, was not the reason for sending him there. Instead, as Bolden testified, Howard's transfer to HVMF was a mistake since his psychological evaluation had been completed when the transfer occurred.

It was accordingly determined to return Howard to SPSM. The exemption for medical transfer under MDOC Rule 791.4401(5)(c) provides that hearings are not necessary for transfers to more restrictive security classifications when "appropriate medical treatment cannot be obtained at the transferring facility." The record in the instant case does not reflect that Howard could not have received his follow-up psychological counseling at RCF. Accordingly, at least as disclosed by the record, the transfer to HVMF had not been for medical reasons as the district court concluded, but had been a routine placement that required notice and a hearing. Hence, without proper notice and a hearing, the transfer that was characterized by Bolden as a mistake, albeit a mistake that was quickly corrected, was nevertheless done in violation of MDOC regulation.

■ The district court made the following findings of fact in denying Howard's second charge, namely that he was improperly confined in protective custody.

> On December 22, 1986 Grinage approved Howard's release to the general population. Howard was not released to the general population until March 1988. In the interim the Bi–Monthly Reports regularly reflected that Howard continued in protective segregation. These reports also reflected Howard's continuing request "to be seen by SCC pursuant to policy." Howard did not otherwise protest or take exception to the fact he continued in protective segregation. Howard did not send any special messages, known as rites [sic], to SPSM officials or file a grievance about his continuation in protective segregation. Considering Howard's familiarity with MDOC rules, his experiences as a resident of MDOC and his known enemies, it is a reasonable inference that Howard had no real desire to be released to the general population at SPSM and was content to continue in protective segregation.

*J.App.* at 25–26. The district court's findings are facially in conflict with the evidence in the record. A review of the bi-monthly reports regarding Howard's status while in protective custody reveals that immediately upon arriving at SPSM he began to request a return to the general prison population. The first report dated August 6, 1986 simply stated that he requested a hearing with the SCC. This report also noted that there were no immediate prospects for reclassification since Howard had enemies in the general population. The next report, dated August 20, 1986, however, reflected his desire to be released from protective custody: "would like to be released to population." He also requested to meet with the SCC. A summary of the subsequent reports disclosed that Howard continued to express his desire to return to the general prison population throughout the remainder of 1986.

> 1. September 6, 1986: Howard requested to see SCC pertaining to policy. Enemies in general population was noted as reason for his further segregation.

> 2. September 20, 1986: Howard requested to see SCC per policy. No comment on reasons for his further segregation.

> 3. October 20, 1986: Howard asked to be transferred to medium. He also requested to see SCC. The status report noted that his request would be screened on the next review date. No reasons were provided for his continued segregation.

> 4. November 26, 1986: Howard requested to see SCC or Housing team pursuant to policy. No comments were noted for continued segregation.

Then, on December 21, 1986, Howard again expressly asked to be released into the general prison population. This status report of December 21, 1986, recommended that Howard's request be granted and that he be released to the general prison population. *J.App.* at 184. No action was taken on this recommendation. The January 24, 1987, status report once again recommended that he should be "considered for reduced [status]." *J.App.* at 187. He again asked to meet with the SCC. After the January 1987 report, Howard's release from protective segregation was never mentioned, although he continued to request to meet with the SCC. On May 20, 1987, he specifically requested the SCC to review his requests in accordance with the requirements of Rule 791.4405, the rule dictating the proper procedures for con-

tinuing an inmate in administrative or protective segregation.

The district court's conclusion that Howard preferred to remain in protective segregation is directly contradicted by the evidence in the record. Several of the status reports in the last half of 1986 specifically indicated Howard's desire to be returned to the general prison population, and the subsequent status reports in 1987 continued to disclose his requests to meet with the SCC pursuant to the rules regarding protective segregation. In addition, the December 1986 report indicated that a reviewing prison official recommended that Howard be returned to the general prison population, while the January 1987 report directed that he should be considered for a lesser segregation status. Based on this overwhelming evidence, it is clear that Howard genuinely desired to be returned to the general prison population and that his continued confinement in protective custody violated proper administrative procedure. The district court's findings to the contrary are accordingly clearly erroneous.

In *Daniels v. Williams,* 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986), the Supreme Court concluded that simple negligence does not support a claim for relief under 42 U.S.C. § 1983; however, the Court left undecided whether less than intentional conduct would rise to an actionable deprivation. In *Nishiyama v. Dickson County, Tennessee,* 814 F.2d 277, 282 (6th Cir.1987), this circuit, sitting *en banc,* decided that gross negligence was sufficient to prove a cause of action under § 1983. Because the district court in the instant case erroneously concluded that plaintiff did not prove a deprivation of his liberty interest, it did not consider or decide whether defendants' conduct rose to the level of gross negligence or deliberate indifference that would be required to support an award of damages under § 1983.

For the reasons aforesaid, the district court's decision is **REVERSED** and **RE-MANDED** to determine if the prison officials' conduct constituted gross negligence or deliberate indifference necessary to award damages and, if so, the amount of damages, if

any, to which plaintiff may be entitled pursuant to 42 U.S.C. § 1983.