**James Ray HARRISON, Plaintiff,**

v.

**Fred RANEY, et al., Defendants.**

No. 92–2410.

United States District Court.
W.D. Tennessee,
Western Division.

Nov. 5, 1993.

Plaintiff pro se.

Alan E. Glenn, Evans & Petree, Memphis, TN, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TURNER, District Judge.

Plaintiff, James Ray Harrison, an inmate at the Lake County Regional Correctional Facility (LCRCF) in Tiptonville, Tennessee,

who was formerly confined at Fort Pillow Prison and Farm (Fort Pillow), filed this *pro se* complaint under 42 U.S.C. § 1983. Harrison's prolix complaint alleged various actions by numerous state defendants over several months between January 21, 1992, and March 20, 1992.

On May 28, 1992, the court dismissed as frivolous under section 1915(d) all of plaintiff's claims except for his claim that he was transferred and reclassified without a hearing.[1] On February 17, 1993, the court entered an order denying plaintiff's motion for summary judgment, addressing various other motions, and setting a deadline for the defendants to file any dispositive motions. On March 31, 1993, the defendants filed a motion for summary judgment. Plaintiff then requested the court to delay ruling until he could receive a response to his motion for production of documents. On May 4, 1993, the court entered an order quashing the plaintiff's motion for production of documents except as to one item, and setting a deadline for production of one item, assuming it existed, and for filing it with the court. On May 17, 1993, the defendants filed additional documents in response to the court's order. Raney's second affidavit is exhibit 1 to the defendants' response. On June 2, 1993, plaintiff filed a final response to the motion for summary judgment, with additional attachments. The defendants' motion is now ripe for decision.

The undisputed facts in this case show that on March 9, 1992, plaintiff was housed at Fort Pillow and assigned a security classification of minimum direct. Affidavit of Fort Pillow Warden Fred Raney, ¶¶ 2, 3, attached as exhibit 1 to defendant's motion for summary judgment (hereinafter cited as Raney Aff. 1). On that date plaintiff was transferred to South Central Correctional Facility in Clifton, Tennessee. *Id.* at ¶ 2. Officials there, not parties to this action, determined plaintiff could not enter that institution's general population because another inmate there was incompatible with plaintiff.[2] *Id.* On

March 13, 1992, plaintiff was returned to Fort Pillow. *Id.* at ¶ 3. On March 18, 1992, plaintiff was transferred to Lake County. *Id.* At no time was his security classification changed as a result of these transfers. *Id.;* Conley Aff. ¶ 2 (exh. 2 to defendant's motion).

TDOC transfer and classifications regulations are enunciated in TDOC Administrative Policy and Procedure (hereinafter TDOC Reg.) Numbers 401.05, 401.08, and 403.01. The versions of those regulations in force in March of 1992 are attachments A, B, and C, respectively, to Fred Raney's first affidavit. The regulations state, in pertinent part:

Definitions:

A. Classification: The continuous process of assessing an inmate's behavior and circumstances to assure that risk and need are assessed and that appropriate decisions are made and implemented to the fullest extent which inmate cooperation and TDOC resources will allow.

TDOC Reg. 401.05(IV)(A) (Nov. 1, 1991).

The TDOC shall utilize the classification panel to review and assess the inmate's current circumstances and make recommendations for any suitable changes in the inmate's status.

TDOC Reg. 401.05(V) (Nov. 1, 1991).

After the inmate's first required reclassification (See Section (A)(1) above), subsequent hearings may occur prior to the date of the regularly scheduled (required) review. Any such hearing resulting in an approved reclassification action shall change the date(s) of future reclassifications. Changes in an inmate's status that **may** necessitate a reclassification include, **but are not limited to,** the following:

1. Circumstances have occurred or information has been received that may warrant a change in custody

2. The inmate has completed a recommended program and is in need of a further and current recommendation

---

1. It was unclear at the time the court left plaintiff's claim on the transfer and reclassification which Tennessee Department of Corrections regulations were in force when Harrison was reclassified.

2. Plaintiff's complaints about his housing assignment and conditions at South Central are irrelevant to the remaining issue in this lawsuit.

3. The warden has directed that the inmate's current classification be reviewed for administrative reasons

4. The inmate has received a recommendation from the disciplinary board panel that he/she be transferred, receive a program change or increase in custody level.

TDOC Reg. 401.05(VI)(C) (Nov. 1, 1991) (emphasis added).

A change of institutional assignment only shall not require a reclassification when such is a direct result of population management.

TDOC Reg. 401.05(VI)(H) (Nov. 1, 1991).

Purpose: To establish a procedure by which inmates are allowed to participate in decisions related to their classification whenever possible.

TDOC Reg. 401.08(II) (June 1, 1992).

Nothing in this policy should be construed as limiting or restricting the warden's authority in classification actions. The intent of Section F above [defining classification panel procedures] is merely to enable the warden to delegate approval authority to the classification panel chairperson in routine classification matters. The warden is, as always, ultimately responsible for the actions of the classification panel and for the appropriateness of classification actions.

TDOC Reg. 401.08(VI)(G) (June 1, 1992).

Regular Transfers

1. When it has been determined that it is appropriate to permanently transfer an inmate to another institution and the classification panel's recommendations have been approved for such transfer in accordance with # 401.04 or # 401.05 the following shall occur:

\*    \*    \*    \*    \*    \*

c. Permanent transfers (other than those listed in (a and b) shall only be for specific and valid reasons:

1. The wardens involved must agree with the transfer.

2. The sending warden must secure the approval of the Director of Classification Programs.

3. The request shall be submitted via OBSCIS.

TDOC Reg. 403.01(VI)(A) (July 15, 1990).

Administrative Transfers

1. A warden may determine, due to an urgent need or in the event of an emergency, that it is in the best interest of an institution or of an inmate that the inmate be moved immediately. In all cases, the following shall occur:

a. The wardens involved must agree with each other after personal conversation.

b. The sending warden shall secure the approval of the Director of Classification Programs during regular business hours via OBSCIS. If the transfer is determined necessary outside of business hours, the Director of Classification Programs shall be notified via OBSCIS by 9:00 a.m. (Central Time) on the next business day.

TDOC Reg. 403.01(VI)(B) (July 15, 1990).

Defendants assert that the plaintiff was transferred for reasons of population management, and not pursuant to reclassification. The defendants contend that as plaintiff was not reclassified, he did not enjoy a liberty interest in notice or a hearing before the transfer.

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 [106 S.Ct. 2548, 2552, 91 L.Ed.2d 265] (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," id. at 323 [106 S.Ct. at 2553], the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the nonmoving party is unable to make such a showing, summary judgment is appropriate.

*Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986).

▪ Pursuant to Rule 56(e), a "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted). A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512.

▪ There is no federal constitutional right to a particular security classification. *Newell v. Brown,* 981 F.2d 880, 883 (6th Cir.1992); *Beard v. Livesay,* 798 F.2d 874, 876 (6th Cir.1986). *See also Hewitt v. Helms,* 459 U.S. 460, 468–69, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983) (state must create liberty interest in placement in particular part of prison population); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (prisoners enjoy no liberty interest in confinement in particular prison); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (same); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). In general, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. at 242, 96 S.Ct. at 2547. Nevertheless, "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. Prior versions of TDOC classification regulations had been interpreted by the Sixth Circuit as creating a liberty interest in an inmate receiving a hearing before his security classification was changed. *Beard v. Livesay,* 798 F.2d 874, 878 (6th Cir.1986).

▪ The defendants contend that any liberty interest plaintiff enjoyed was not triggered by the transfer. Recently, however, the State Attorney General has argued in another case involving TDOC reclassification regulations, that the regulations and their descendants, adopted since *Beard,* have eliminated the mandatory language that limits the discretion of the warden in classification decisions. The state relied on *Meeks v. Reynolds,* No. Civ. 3–92–434 (E.D.Tenn. July 6, 1993) (unpublished), holding that the regulations do not create a liberty interest. The court finds this argument equally persuasive here.

> If the decision maker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' ibid., the State has not created a constitutionally protected liberty interest.

*Beard,* 798 F.2d at 876. In *Newell v. Brown,* 981 F.2d 880, 883 (6th Cir.1992), the Sixth Circuit analyzed a Michigan classification regulation using the language "the following factors *may* be considered in determining classification...." *Id.* The court found that the regulations "lack the requisite relevant mandatory language" and concluded that "no liberty interest protected by the Due Process Clause of the Fourteenth Amendment has been created." *Id.* at 884.

Similarly, TDOC Reg. 401.05 lacks any mandatory language that would require the warden to base his decision on particular criteria, or to make a decision differently because of such criteria. Equally clearly, TDOC Reg. 401.08, enunciating the procedures to be used in conducting the classifica-

tion hearing, does not contain any explicitly mandatory language that would limit the warden's discretion on classification decisions. Furthermore, the regulation explicitly confers unlimited discretion on the warden.

■ To the extent that these regulations require a hearing to follow certain procedures, they do not create any liberty interest. "[P]rocedural requirements alone cannot establish a liberty interest." *Newell v. Brown*, 981 F.2d at 885 (quoting *Beard*, 798 F.2d at 877).

The same is true of TDOC Reg. 403.01. That regulation does not state a single substantive predicate for a transfer decision. In particular, the regulations do not prohibit a transfer that is not accompanied by a reclassification and a reclassification hearing. Plaintiff thus had no liberty interest in being reclassified prior to a transfer.

Plaintiff's opposition to the defendants' motion emphasizes the mandatory language used to state the transfer procedures. Again, however, "procedural requirements alone cannot establish a liberty interest." *Newell v. Brown*, 981 F.2d at 885. The regulations nowhere state a list of substantive predicates. Rather, if two wardens decide, with the Director of Classification's approval, that an inmate should be transferred, there is no substantive limit to their discretion. Reg. #403.01 does enunciate a detailed procedure to ensure that the warden's superiors are able to maintain oversight of transfer decisions. But the regulations merely ensure that prison officials will operate efficiently in transferring prisoners, not that they will make a particular transfer decision in light of particular facts. If these regulations create any liberty interest, it resides in the Director of Classification Programs, not in inmates.

This result is reinforced by contrasting the regulations at issue here with those examined by the Sixth Circuit in a very recent opinion. In *Howard v. Grinage*, 6 F.3d 410, 412–13 (6th Cir.1993), the court examined the Michigan classification regulations that preceded those analyzed in *Newell*. Those old regulations provided, in pertinent part: "Each prisoner **shall** be classified according to [various factors].... A prisoner **shall** be

classified according to the security requirements necessary for the following: [stating other factors]." *Id.* 6 F.3d at 412–13 (emphasis in court's opinion). The regulations went on to state that "the prisoner **shall** be assigned 1 of the following categories of security classification which is the **least restrictive** level of custody consistent with the requirements of [the above quoted regulations]." *Id.* (emphasis in court's opinion). The court found these mandatory regulations to be similar to those addressed in *Beard*.

The regulations before this district court do not remotely resemble the above provisions in *Howard*. The court concludes that they also do not resemble the mandatory provisions in *Beard*. Thus that decision no longer applies to current TDOC classification and transfer regulations.

The court therefore follows *Meeks* in holding that TDOC regulations do not create a liberty interest requiring state officials to afford any due process under the Fourteenth Amendment before either reclassification or transfer of inmates in TDOC custody. As plaintiff had no liberty interest in a particular classification or transfer decision, it follows *a fortiori* that he suffered no deprivation of due process when he was transferred without a hearing. *Newell*, 981 F.2d at 884.

■ Furthermore, even if some types of transfers did require a reclassification and the due process protections required by *Beard*, there is no genuine issue of material fact that population management transfers do not. TDOC Reg. 401.05(VI)(H). Raney Aff. 1, ¶2; Raney Aff. 2, ¶4 and Attachment B. The reclassification procedures simply do not apply to population management transfers. There is no genuine issue of material fact that plaintiff was transferred on both occasions as a result of a population management decision. Raney Aff. 1, ¶2; Raney Aff. 2, ¶¶3–4, Attach. A, B. Thus plaintiff had no liberty interest in reclassification and a hearing before either transfer in this case.

■ Plaintiff's assertion that the transfer was not for population management is completely unsupported and meritless. Because plaintiff has no liberty interest in assignment

to a particular prison, the substantive merit of defendants' decision to transfer him is beyond the scope of federal court review. Therefore this court cannot second guess the defendants' judgment that inmate population control necessitated plaintiff's transfer. Plaintiff has produced not one iota of evidence to support his claim that the transfer was for some other purpose. In particular, he has completely failed to support his claim that the transfer took place in retaliation for protected legal activity. His speculative assertions regarding possible medical reasons for his transfer are simply irrelevant to the real issue in this case of whether the state reclassification and transfer regulations even create a liberty interest. Plaintiff thus has failed to rebut the proof adduced by defendants in support of summary judgment.

█ Finally, as plaintiff had no liberty interest in remaining at Fort Pillow, or in receiving a hearing before his transfer, the defendants did not violate his clearly established rights to due process by transferring him. The defendants are thus protected by qualified immunity for their decision to transfer him. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Wolfel v. Morris,* 972 F.2d 712, 719 (6th Cir.1992); *Caldwell v. Moore,* 968 F.2d 595, 599 (6th Cir.1992).

As there is no genuine issue of material fact that defendants did not violate plaintiff's due process rights, they are entitled to summary judgment, and their motion for summary judgment is granted.

█ The final issue to be addressed is whether plaintiff should be allowed to appeal this decision *in forma pauperis.* Twenty-eight U.S.C. § 1915(a) provides that an appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith.

The good faith standard is an objective one. *Coppedge v. United States,* 369 U.S. 438, 445, 82 S.Ct. 917, 921, 8 L.Ed.2d 21 (1962). An appeal is not taken in good faith if the issue presented is frivolous. *Id.* The same considerations that lead the court to grant the defendant's motion for summary judgment also compel the conclusion that an appeal would be frivolous. No reasonable jurist could find that an inmate has a liberty interest under TDOC regulations # 401.05, 401.08, or 403.01. Even less could a reasonable jurist find that this plaintiff had a liberty interest in a population management transfer. Plaintiff thus has no due process claim, and there is not even an arguably meritorious legal issue for plaintiff to raise on appeal.

It is therefore **CERTIFIED,** pursuant to 28 U.S.C. § 1915(a), that any appeal in this matter by plaintiff, proceeding *in forma pauperis,* is not taken in good faith.

**IT IS SO ORDERED.**