SHAKUR ABDULLAH, APPELLANT, V. NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES ET AL., APPELLEES.

517 N.W.2d 108

Filed June 10, 1994. No. S-92-512.

Shakur Abdullah, pro se.

Don Stenberg, Attorney General, and Terri M. Weeks for appellees.

Kenneth N. Thompson, amicus curiae.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

HASTINGS, C.J.

Shakur Abdullah, plaintiff, appeals from the judgment of the district court which, on his petition for declaratory judgment, denied his claim that a portion of the adult inmate classification manual of the Department of Correctional Services is unconstitutional. Abdullah assigns as error (1) the district court's finding that the nonpromulgation of the particular rule pursuant to Neb. Rev. Stat. § 84-901 et seq. (Reissue 1987 & Cum. Supp. 1992) was not an issue in the action and (2) the finding that Abdullah's automatic 3-year waiting period before he could become eligible for a custody change under the adult inmate classification manual did not violate the Due Process and Equal Protection Clauses of the federal or state Constitutions. We affirm.

When a declaratory judgment action presents questions of law, an appellate court has an obligation to reach its conclusion independent from the conclusion reached by the trial court with regard to those questions. *How v. Mars*, 245 Neb. 420, 513 N.W.2d 511 (1994); *National Am. Ins. Co. v. Continental Western Ins. Co.*, 243 Neb. 766, 502 N.W.2d 817 (1993).

Plaintiff Abdullah is an inmate of the Nebraska State Penitentiary currently serving a life sentence for first degree murder and a concurrent sentence of 15 to 50 years for shooting to kill or maim. See *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977). Abdullah testified that he was in maximum custody from 1975, when he entered the penitentiary, until 1983. Sometime during 1983, a new custody classification program was adopted which allowed his custody to be reduced to medium, and eventually, minimum custody. However, in 1985 the classification system was again revamped, and, according to Abdullah, minimum custody was summarily taken away from anyone in that classification. At that time, he was placed

in medium custody. During his incarceration, Abdullah has received several misconduct reports. The most recent report prior to this action was received on March 21, 1991.

On May 10, 1991, Abdullah's request for promotion to minimum custody was denied by the acting unit administrator, due to disciplinary reports received during the past 3 years. Abdullah appealed that decision as a "step one" grievance to chief executive officer and superintendent Howard Ferguson, who denied the appeal on May 23. Abdullah filed a "step two" grievance to the director of the Department of Correctional Services, Harold Clarke. The step two appeal was denied on June 5 by Clarke, who noted in his response that Abdullah had not stated any reason for his appeal.

For the purposes of inmate classification and assignments, the adult inmate classification manual provides:

1. LIFE TO LIFE (Class IA felony)

Inmates serving a life sentence for a Class IA felony, in which the minimum sentence is also life, shall not be eligible for consideration for promotion to minimum custody until they have served at least ten (10) calendar years; and shall not be eligible for consideration for promotion to community custody until they have been granted a sentence commutation to a definite term of years by the Board of Pardons. Inmates shall be free of misconduct for the immediate past three (3) years to be considered for promotion to minimum or community custody grades.

Clarke testified that the overriding purpose of the classification system is, first, to protect the public, and also to facilitate rehabilitation, protect offenders, and aid in management of the department. He also explained that the reason for the requirement that a life-to-life inmate remain misconduct-free for 3 years prior to promotion is that it is the position of the department that those inmates are more dangerous individuals, and they are therefore expected to adhere to more stringent standards.

In determining whether an inmate may have a change in custody, an objective factoring system is employed, which evaluates issues such as the nature of the offender's crime, the

amount of time that a person might be serving, and the offender's adjustment within the facility.

The State alleged a lack of jurisdiction over this action, both by demurrer and answer in the trial court. Those defenses were denied. The district court found that Abdullah had failed to sustain his burden of proving that the contested rule regarding reclassification of inmates serving life-to-life sentences is invalid or unconstitutional and ordered his petition dismissed. Abdullah has appealed; the State has not cross-appealed.

Abdullah first asserts that the district court erred in finding that the nonpromulgation of the rule pursuant to § 84-901 et seq. was not an issue in the action. Abdullah's petition states only that "[t]he Defendants are currently executing an unpromulgated rule and or policy" (emphasis omitted) and goes on to assert that the rule is in violation of his equal protection rights. It does not allege that the rule should have been promulgated pursuant to § 84-901 et seq. or that the agency exceeded its statutory authority. The district court thus did not receive evidence or rule on the issue of promulgation of the adult inmate classification system; therefore, the issue is not properly before this court.

A party will not be permitted to plead one cause of action and upon trial rely upon proof establishing another. *Barker v. Wrehe*, 217 Neb. 793, 351 N.W.2d 412 (1984).

Proof must correspond with the allegations in the pleadings, and relief cannot be granted upon proof of a cause substantially different from the case made in the pleadings. *Id.*; *Badran v. Bertrand*, 210 Neb. 747, 316 N.W.2d 763 (1981).

Issues not properly presented to and passed upon by a trial court may not be raised on appeal. *In re Estate of Seidler*, 241 Neb. 402, 490 N.W.2d 453 (1992); *K & K Farming v. Federal Intermediate Credit Bank*, 237 Neb. 846, 468 N.W.2d 99 (1991).

As his second assignment of error, Abdullah asserts that the district court erred in finding that the appellees' automatic 3-year waiting period before Abdullah could become eligible for a custody change did not violate the Due Process and Equal Protection Clauses of the federal or state Constitutions. Abdullah alleges in his brief that there is a "great dissimilar treatment of residents as to when [a] misconduct report

(major/minor) will clear allowing them to become eligible for a custody change." Brief for appellant at 10. He further argues that

"[t]he Equal Protection clause entitles similarly situated persons to equal treatment and or application of the law, rules and regulations, and the Appellant contends that the treatment he has received was dissimilar from the treatment that was afforded other residents within the [Department of Correctional Services] for receiving the same type of misconduct reports."

Brief for appellant at 16-17.

In *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), inmates brought a class action challenging two regulations promulgated by the Missouri Division of Corrections. In reviewing the challenged regulations, the Court found:

[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union*, 433 U. S. [119, 128, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.

482 U.S. at 89.

Director Clarke was asked to explain the requirement that an inmate who is serving a life-to-life sentence remain misconduct-free for 3 years prior to being promoted to minimum custody. He stated:

Quite simply, we felt one, the Parole Board requirement in part governs that they will not consider an offender who is serving life to life for any contacts within the community prior to having served at least ten years, and secondly, it is the position of the Department that those are more

dangerous individuals within the Department of Correctional Services, and so therefore, they are expected to adhere to more stringent standards or higher standards for them.

Clarke stated that the only inmates serving under more stringent conditions than those serving life-to-life sentences are the offenders in death row. Clarke further explained that offenders who are serving "ten-to-life" are required to remain misconduct-free for 2 years rather than 3, because they are not considered as dangerous in the eyes of the courts and are therefore not required to adhere to the same standards. When asked to discuss why the department does not have a system to rate the various types of misconduct, he stated:

Offenders are required to behave. They are required to conform to norms, rules and standards, and it's important that an offender who is serving a life sentence or ten-to-life sentence understand that they are going to be expected to adhere to rules and regulations and so forth. If they are not able to do so within prison, there is a reasonable expectation that they are not going to be able to adhere to those rules, regulations, et cetera, in a free society. So therefore, we do not rate them.

The challenged rule, which requires a life-to-life inmate to be misconduct-free for 3 years in order to be considered for promotion to minimum custody, is reasonably related to legitimate penological interests of protection of the public, protection of offenders, rehabilitation, and management of correctional institutions. Thus, the district court did not err in finding that Abdullah had failed to sustain his burden of proving that the contested rule is unconstitutional.

Although the record indicates that Abdullah received a hearing in regard to his March 1991 misconduct report, he apparently contends that due process requires a second hearing and "opportunity to be heard at said hearing to refute any previously received misconduct reports." Brief for appellant at 18.

In order to implicate the protections of the Due Process Clause, there must be a protectible liberty interest of the inmate's at stake. *Lynch v. Nebraska Dept. of Corr. Servs.*, 245

Neb. 603, 514 N.W.2d 310 (1994); *Billups v. Nebraska Dept. of Corr. Servs. Appeals Bd.*, 238 Neb. 39, 469 N.W.2d 120 (1991).

While Abdullah does not articulate the argument, a statute or rule may create a liberty interest protected by due process guarantees. See, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979); *Wolff v. McDonnell*, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Howard v. Grinage*, 6 F.3d 410 (6th Cir. 1993). However, as stated by the Eighth Circuit in *Flittie v. Solem*, 827 F.2d 276, 279 (8th Cir. 1987):

> [T]o create a liberty interest a state statute must place significant substantive restrictions on the decision making process. *Dace v. Mickelson*, 816 F.2d 1277, 1279-80 (8th Cir. 1987) (en banc). Additionally, the statute must contain mandatory language similar to that in the statutes in issue in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). These "same standards apply to a review of a state rule, regulation, or practice . . . ." *Dace v. Mickelson*, 816 F.2d at 1279.

In *Greenholtz*, inmates of the Nebraska Penal and Correctional Complex brought a civil rights action against the Nebraska State Board of Parole, alleging due process violations in the board's consideration of the inmates' suitability for parole. The inmates argued that a protectible expectation of parole was created by statutory language which provided that the Board of Parole " '*shall* order [the offender's] release unless it is of the opinion that his release should be deferred because [of one of four reasons].' " (Emphasis supplied.) 442 U.S. at 11. The Supreme Court found that "the expectancy of release provided in this statute is entitled to some measure of constitutional protection. However, we emphasize that this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." 442 U.S. at 12.

In examining the adult inmate classification and assignment regulations, we find no mandatory language which would give rise to an expectation of custody promotion. On the contrary, in addition to the language involving recent misconduct reports

which preclude promotion to a minimum custody classification, Abdullah also falls within a category of inmates who "shall *not* be promoted to minimum custody except after review by and upon approval of the Director's Review Committee," by virtue of the violent nature of his offense.

"[T]o obtain a protectible right 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' " *Greenholtz*, 442 U.S. at 7.

Because prison inmates have no inherent due process right to have their security level downgraded, see *Howard v. Grinage, supra*, and the regulatory language did not itself create a protectible expectation of custody promotion, there is no merit to Abdullah's assertion that he was entitled to a hearing. See, also, *Abdullah v. Nebraska Dept. of Corr. Servs.*, 245 Neb. 545, 513 N.W.2d 877 (1994).

The judgment of the district court was correct, and it is affirmed.

AFFIRMED.